NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BUNZL DISTRIBUTION
NORTHEAST, LLC,
         Plaintiff,

v.

MICHAEL BOREN,
         Defendant.

Civ. No. 07-3706 (GEB) (JJH)

**MEMORANDUM OPINION**

**BROWN, Chief Judge**

    This matter comes before the Court upon the motion of plaintiff Bunzl Distribution Northeast, LLC ("Plaintiff" or "Bunzl") for civil contempt. The Court has considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, this Court will grant Plaintiff's motion.

**I.    BACKGROUND**

    On August 1, 2007, Plaintiff filed a Complaint against Defendant Michael Boren ("Defendant" or "Boren") alleging that Boren breached a non-solicitation provision in his Employment Agreement by soliciting customers while he was employed at Bunzl and after he resigned and went to work for Imperial Bag & Paper ("Imperial"), a direct competitor of Bunzl.

    On August 17, 2007, the Court entered a Consent Order Granting Temporary Restraining Order ("TRO"). The TRO prohibited Boren from, among other things, "[c]ausing or attempting to cause any company listed on Attachment A hereto to divert, terminate, limit, or in any manner modify or fail to enter into any actual or potential business relationship with Bunzl." Attachment A lists 82 Bunzl customers ("Restricted Customers"). The TRO also prohibited Boren from

"[p]roviding competitive services as that term is defined in the Employment Agreement (Ex. A to Plaintiff's Verified Complaint) to any" Restricted Customer. Boren's Employment Agreement states that

> "competitive services" shall include products, merchandise and/or services which are of the same general type, perform similar functions or are used for the same purposes as the products, merchandise and/or services which have been sold, provided or offered by [Bunzl] at any time during Employee's last three (3) years of employment with the Company.

Ex. A to Plaintiff's Verified Complaint at 3. The TRO remained in effect until September 6, 2007.

On August 31, 2007, the Court entered a Consent Order Granting Injunction ("Injunction"). The Injunction used language identical to that in the TRO, except that the prohibitions cited above apply "from the date of this Order through January 23, 2008."

On October 1, 2007, Plaintiff filed the present motion for civil contempt alleging that Boren violated the TRO and the Injunction (collectively "Orders"). The Court will analyze the specific allegations below.

## II.     DISCUSSION

### A.     Standard of Review

In order to find a party in civil contempt, the Court "must find that (1) a valid court order existed, (2) the [party] had knowledge of the order, and (3) the [party] disobeyed the order." John T. ex rel. Paul T. v. Delaware County Intermediate Unit, 318 F.3d 545, 552 (3d Cir.2003) (quoting Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3d Cir.1995)). A finding of civil contempt must be supported by "clear and convincing" evidence. Id. Thus, "[a] contempt citation should not be granted if 'there is ground to doubt the wrongfulness of' the [party]'s

conduct." Harris, 47 F.3d at 1326 (citation omitted).  Similarly, the "resolution of ambiguities ought to favor the party charged with contempt." Id.  However, "[t]he validity of the underlying order is not open to consideration." Id.

The Third Circuit has recognized that substantial compliance is a defense to civil contempt.  Harris, 47 F.3d at 1324. ("a defendant may not be held in contempt as long as it took all reasonable steps to comply").  The burden is on the defendant to "introduce evidence beyond 'a mere assertion of inability,' and to show that it has made 'in good faith all reasonable efforts to comply.'" Id. (citations omitted).  However, good faith alone is not a defense to civil contempt and willfulness is not a necessary element.  Robin Woods Inc. v. Woods, 28 F.3d 396, 399 (3d Cir. 1994).

      B.    Application

In the present case only the third prong of the civil contempt analysis is contested.  Defendant does not dispute that the TRO and the Injunction are valid court orders and that Boren had knowledge of the Orders.  Defendant contends that the allegations set forth by Bunzl do not constitute civil contempt.  Def. Br. at 25.  Nonetheless, Defendant admits he committed other actions that were in violation of the Injunction.  Defendant contends that these other actions, sales to four Restricted Customers, are not grounds for civil contempt because the sales were insubstantial in value and Boren has offered to make Bunzl whole.

      1.    **Admitted Violations**

The Defendant admits "in candor to this Court" that "during the period in which Imperial was reviewing its records in response to this motion, it was determined that Boren has in fact sold a small number of orders to four shared customers on the restricted list at which there did

3

not appear to be any currently active Imperial salesman." Def. Br. at 21; Certification of Michael S. Boren ("Boren Cert.") ¶ 17.  Plaintiff responds that this concession was made after it requested sales records by subpoena from Imperial and thus was no real concession because Plaintiff was about to learn of the sales anyway.  Pl. Reply Br. at 1.  Boren made sales to "Delmonico Gourmet, Food Trends, East Side Poultry and Bocca" after entry of the Injunction because Boren was "laboring under his mistaken view that he was permitted to sell to shared customers."  Def. Br. at 23; Boren Cert. ¶ 17.  These incidents are not "listed in Bunzl's motion papers," but "Boren believes that these sales had to be disclosed to the Court."  Def. Br. at 24; Boren Cert. ¶ 17.  "These sales resulted in an approximate net profit of $4,907.14 for Imperial."  Def. Br. at 23; Affidavit of William Needham ("Needham Affidavit") ¶ 9.  Boren alleges that "Imperial shall issue a check to reimburse Bunzl for the net profits it received" on these sales.  Def. Br. at 24; Needham Aff. ¶ 9.  Further, Boren asserts that "Imperial has directed Boren not to have any contact at all with any of the customers on the restricted list."  Def. Br. at 24; Certification of Kenneth I. Nowak ("Nowak Cert.") Ex. A.

     Defendant concedes that these actions violate the Injunction.  Def. Br. at 24.  Defendant argues that despite these actions, he was in substantial compliance with the Injunction because "[f]or a salesman who sold approximately $9 million of product . . . during the last full year . . . the sale of product producing a profit of less than $5,000 cannot be deemed substantial or contemptuous."  Def. Br. at 33-34.  The Court disagrees.  "Substantial compliance" is not measured by a ratio of sales to profits, but is determined by whether the party took "all reasonable steps" to comply with the order.  See Harris, 47 F.3d at 1324.  There is no evidence showing that Boren took "all reasonable steps" to comply with the Injunction.  For example,

although Boren claims to have not properly understood the Injunction, the Injunction he negotiated and consented to, there is no evidence that he took the reasonable step of consulting with counsel to ascertain its meaning.  Of course, Boren's alleged good faith is not, in itself, a defense. Id.

### 2. Majestic Deli Allegations

Plaintiff alleges that Shaun Joseph ("Joseph"), a Bunzl sales representative assigned to many of the accounts of the Restricted Customers Accounts after Boren's resignation, "encountered Defendant on the premises of Majestic Deli, a Restricted Customer" on August 22, 2007.  Pl. Br. at 3; Declaration of Shaun Joseph ("Joseph Decl.") ¶ 6.  Plaintiff also alleges that on August 29, 2007, Joseph saw Defendant meeting with Majestic Deli's owner" and that in the presence of the owner, Defendant stated that "if Bunzl were giving [Majestic Deli] a certain percent off invoice, he would give the customer a higher percent off invoice." Pl. Br. at 3; Joseph Decl. ¶ 7.  Additionally, on August 29, 2007, while in front of the customer, Defendant asked Joseph questions concerning Bunzl's changes in management.  Id.

Defendant admits that "[o]n August 22, Boren did go to Majestic Deli," but he did so "in order to address and collect upon an unpaid invoice with respect to a sale he improperly made to Majestic after he left Bunzl, but well before the consent injunction was issued." Def. Br. at 12; Boren Cert. ¶ 22.  Defendant also states that "on August 29, 2007, Boren again went to the Majestic Deli seeking payment for the unpaid invoice" and that he spoke to the owner and "in an apparent effort to jokingly embarrass Boren and/or Mr. Joseph, [the owner] stated that he was only getting five percent off invoice price for products he purchased from Bunzl." Def. Br. at 13; Boren Cert. ¶ 23.  "Boren . . . replied, in the same spirit, that come the end of January, he would

see what he could do for him. " Def. Br. at 13; Boren Cert. ¶ 24.  "As of October 22, 2207, Boren believes that this invoice is still outstanding." Def. Br. at 13; Boren Cert. ¶ 23. Defendant also asserts that "Boren . . . inquired about the retirement of Mike Brown, a sales manager who had been a good friend of his at Bunzl.  Boren simply asked Mr. Joseph who was replacing him." Def. Br. at 13; Boren Cert. ¶ 23.

Defendant argues that the Orders do not prohibit Boren from visiting customers so long as he does not attempt to divert or terminate a business relationship with Bunzl.  Therefore, the Orders "cannot reasonably be deemed to be adequate notice to him under the law."  Moreover, Boren argues that the conversations are not "tainted or taboo" and that "they do not violate any 'precisely drawn' and 'explicit' bar." Def. Br. at 33.

Although the Court agrees that the Orders do not prevent Boren from having social conversations with Restricted Customers, the Court concludes that one statement admittedly made by Boren to the owner of Majestic Deli violates the TRO.  Specifically, Boren admits that in response to the owner's statement about "only getting five percent off invoice price for products he purchased from Bunzl," Boren stated that "come the end of January, he would see what he could do for him." Def. Br. at 13; Boren Cert. ¶ 24.  Boren contends that statement simply was meant to "reinforce" the fact that Boren "would not sell to [Majestic]" until January. Boren Cert. ¶ 25.  The Court does not find this plausible.  The discussion involved the percent off invoice price that the owner received from Bunzl, and Boren's statement that "he would see what he could do" clearly refers to the potential that Boren may provide the owner with better prices than Bunzl.  The conversation, as admitted by Boren, provides clear and convincing evidence of yet another violation of the TRO because it is an attempt to cause a Restricted Customer to

modify or fail to enter into an actual or potential business relationship with Bunzl.

### 3.  Greenwich Village Fish Company Allegations

Plaintiff also alleges that on September 14, 2007 Defendant visited Greenwich Village Fish Co., a Restricted Customer.  Pl. Br. at 4; Declaration of James G. LeViness ("LeViness Decl.") ¶ 6.  Defendant admits that "Boren had received a phone call from . . . an employee at Greenwich Village Fish Co., requesting that he . . . bring her a sample of an aluminum . . . container."  Def. Br. at 14; Boren Cert. ¶ 26.  Boren admits that he "brought her the sample."  Def. Br. at 15; Boren Cert. ¶ 26.  Defendant contends that these activities should not be construed as "competitive services" prohibited by the Injunction because the container was "not part of Bunzl's regular inventory, and would have been a special order product."  Id.  Further, Boren states that he told the employee that he could not sell any products to her until the end of January 2008.  Def. Br. at 14-15; Boren Cert. ¶ 27.  Finally, "they . . . indicated that they would see each other in January."  Id.

The Court concludes that providing the aluminum container is yet another violation of the Injunction because it is "[p]roviding competitive services as that term is defined in the Employment Agreement."  Boren admits that Bunzl offers the aluminum container for sale, albeit as a "special order product." Def. Br. at 14; Boren Cert. ¶ 26.  Therefore, by bringing the container to a Restricted Customer, Boren provided "competitive services" because he provided "products, merchandise and/or services of the same general type as those sold, provided or offered by Bunzl."  See Ex. A to Plaintiff's Verified Complaint at 3.

### 4.  Doria's Enterprises Allegations

Plaintiff also alleges that on September 14, 2007 Defendant "parked his car in close

proximity to" Doria's Enterprises, a Restricted Customer. Pl. Br. at 4; LeViness Decl. ¶ 7. Boren admits that he went to Doria's Enterprises "to look at Dino Doria's 2003 Anniversary Edition Corvette, which he was selling." Def. Br. at 16; Boren Cert. ¶ 28. Boren states that during the meeting, "Boren never engaged in any discussions regarding business and/or sales." Id.

The Court concludes that there is not clear and convincing evidence that Boren violated the Injunction with respect to his activities at Doria's Enterprises.

### 5. Fairway Wholesale and Distribution Company Allegations

Plaintiff alleges that on September 24, 2007, Defendant made visits to Fairway Wholesale and Distribution Company ("Fairway"), a restricted customer. Pl. Br. at 4; LeViness Decl. ¶ 8. On September 27, 2007, Joseph observed Defendant meeting with a Fairway employee and taking notes. Pl. Br. at 5; Joseph Decl. ¶ 11.

Boren admits that he was at Fairway on September 24, 2007. He states that he met with Jerry Solomon, "a longtime salesman for Imperial [who] has serviced Fairway for approximately twenty (20) years" at the "Fairway location on 74th Street so that Mr. Solomon could show [him] how to place orders in his stead while [Mr. Solomon] took a week long vacation." Def. Br. at 17-18; Boren Cert. ¶¶ 32-33. Additionally, Boren "met with Mr. Solomon that same day at the Fairway location on 12th Avenue, and at the 74th Street location on September 27, for the same purpose." Id. Defendant admits that for the week beginning September 30th, he "went to the two Fairway locations in New York City in order to take inventory and place orders." Def. Br. at 18; Boren Cert. ¶ 34. Boren contends that "[t]his account has always been a shared account between Bunzl and Imperial, and Boren did not sell any additional products to Fairway during this period, nor did he cause there to be any increase in the average amount of items usually sold

8

on a weekly basis." Id.  Boren asserts that he did not make "any sales other than the sales that were always made by Mr. Solomon." Id.  Boren also asserts that "Imperial has directed Boren that he may no longer 'cover' for Imperial salesman [sic] who service customers shared by Bunzl and Imperial." Def. Br. at 19; Needham Aff. ¶ 6.

The Court concludes that Boren violated the Injunction once again by taking inventory and placing orders at a Restricted Customer.  Neither party disputes that taking inventory and placing orders is a service of the same general type as the services which have been sold, provided or offered by Bunzl.  That Boren's actions were allegedly taken to provide "cover" for another Imperial employee that was on vacation is of no consequence because the definition of "competitive services" in the Employment Agreement provides no such exception.

### 6. Market Coffee Shop Allegations

Plaintiff alleges that Joseph saw Defendant in Market Coffee Shop, a Restricted Customer, meeting with the owner on September 25, 2007.  Pl. Br. at 4; Joseph Decl. ¶ 8.  Defendant allegedly stated in front of the Restricted Customer that he knew Bunzl's prices and what Bunzl offers and that the Restricted Customers would "be gone by January."  Pl. Br. at 4-5; Joseph Decl. ¶ 8.  Defendant also allegedly asked Joseph 'how it was going babysitting his accounts."  Pl. Br. at 5; Joseph Decl. ¶ 8.

Boren admits that he "went to Market Coffee Shop on that date to inquire about an invoice that appeared to not have been fully paid."  Def. Br. at 19; Boren Cert. ¶ 36.  "This invoice was related to sales he made on behalf of Imperial prior to the entry of the Consent Temporary Restraining Order."  Id.  While there, "Boren met with . . . one of the owners" and "also saw Mr. Joseph."  Def. Br. at 20; Boren Cert. ¶ 37.  In front of the owner, "Boren jokingly

9

asked Mr. Joseph how he was enjoying babysitting his accounts until January." Id. Boren does not deny stating in front of the owner of Market Coffee Shop that he knew Bunzl's prices and what products Bunzl offers.

The Court also concludes that Boren violated the Injunction at Market Coffee Shop. Specifically, Boren's statements that he knew what Bunzl offered and their prices and that Joseph was "babysitting" his accounts until January provide clear and convincing evidence of an attempt to cause the Market Coffee Shop to modify an actual or potential relationship with Bunzl.

  **C. Sanction**

The Court has "wide discretion in fashioning" an appropriate sanction against a party in contempt. Robin Woods Inc., 28 F.3d at 399. In determining the extent of the sanction, a party's intent and willfulness are relevant. Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148-49 (3d Cir. 1994). Civil contempt sanctions are meant to serve two purposes: (1) to coerce the defendant into compliance with the court's order; and (2) to compensate for losses sustained by the disobedience. Robin Woods Inc., 28 F.3d at 400 (citing McDonald's Corp. v. Victory Investments, 727 F.2d 82, 87 (3d Cir.1984)).

Plaintiff requests an Order: (1) prohibiting Boren from having any contact with any owner or employee of any Restricted Customer; (2) requiring Boren to provide monthly certifications, subject to the penalty of perjury, that he has not violated the Injunction; (3) extending the term of the Injunction for a period of six months, and providing that the Injunction shall be extended for an additional six months each time that Defendant violates the Injunction; (4) requiring Boren to pay Bunzl's attorney fees, costs and investigative fees related to this Motion; (5) requiring Boren to produce within seven days, copies of all call records, sales records, orders, invoices, or

calendars that reference meetings or business conducted with any of the Restricted Customers since August 17, 2007.

Defendant asserts that "Boren believed, wrongly as it turned out, that he was not prohibited from making sales to shared customers" and thus "his conduct was not in willful disregard of the Court's Orders." Def. Br. at 36. Boren suggests that, if the Court finds Boren in contempt, the Court "effectuate the purpose of the doctrine of civil contempt by directing Boren to avoid all contact of any nature with any customer on the restricted list, but . . . not impose any other sanctions." Id.

Although the Court does not interpret the Injunction as prohibiting Boren from having any contact with any Restricted Customer during the period in which the Injunction is in effect, both parties have requested that the Court impose such a prohibition. Def. Br. at 39; Pl. Br. at 8. Because of this request and because it is a simple, practical method by which to ensure compliance with the Injunction, the Court will impose such a prohibition.

The Court also concludes that it is appropriate to extend the Injunction, as modified, so that Bunzl has a period of six months without a violation by Boren. The Injunction provides that Paragraphs 2 and 3 remain in force through January 23, 2008. As Bunzl recognizes, the "intended benefit" of these provisions is a "period of six months where Defendant is not engaged in conduct to move business so that Bunzl has an opportunity to solidify its relationship with the customer and prevent the loss of business when the non-solicitation expires." Pl. Br. at 8. As of October 19, 2007, Boren was instructed by Imperial to "cease any and all communication of any kind with any" Restricted Customer. See Nowak Cert., Ex. A. The Court concludes that extending the Injunction for six months from October 19, 2007 would ensure Bunzl a continuous

11

six month period without a violation by Boren. Thus, the Court will extend the Injunction, as modified, to April 19, 2008.

Plaintiff requests that Defendant be required to produce various records relating to his prior interactions with all Restricted Customers, so that any additional violations of the Orders can be investigated and established. In light of the numerous known violations of the Orders, the Court concludes that such documents should be produced. In its Reply Brief, Plaintiff states that "the information sought . . . will be obtained" because Imperial has agreed to produce such records to Bunzl. Pl. Reply Br. at 12 n.3. Therefore, the Court will order Boren to produce the requested documents to the extent they have not previously been produced by Imperial.

Additionally, the Court grants Plaintiff's request that Boren be required to file monthly certifications of compliance, subject to penalty of perjury. Boren has repeatedly violated the Injunction and the Court concludes that monthly certifications will help ensure that he does not continue to violate the Injunction, as modified.

Finally, the Court concludes that Plaintiff should be reimbursed for its reasonable expenses, costs and fees associated with Defendant's repeated violations of the Orders. The Court has an "inherent power to reimburse a party for outlays incurred in securing an adjudication of contempt." Halderman v. Pennhurst State Sch. & Hosp., 49 F.3d 939, 941 (3d Cir. 1995); see also Lichtenstein v. Lichtenstein, 425 F.2d 1111, 1113 (3d Cir. 1970) ("[i]n a contempt proceeding, the court may, in its discretion, award expenses, costs, and fees to the petitioner"). Although the Court has "wide discretion in fashioning a remedy," Robin Woods Inc., 28 F.3d at 399, it is an abuse of that discretion to award expenses, costs and fees "unless there is some indication of record as to the reasonableness" of the award. Lichtenstein, 425 F.2d

at 1114.  At this time, the record contains no evidence by which the reasonableness of an award can be tested.  Thus, the Court requests a detailed affidavit from Plaintiff and briefs from both parties regarding the reasonableness of the expenses, costs and fees incurred in securing the adjudication of contempt.

### III.    CONCLUSION

For the above reasons, the Court will grant Plaintiff's motion for an Order holding Defendant in contempt.  An appropriate form of order is filed herewith.


Dated:  January 2, 2008


    s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.